# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**ROBERT L. ABEITA,**

        **Plaintiff,**

**vs.**                                    **No.  02cv0929 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Abeita's) Motion to Reverse and Remand for a Rehearing **[Doc. No. 11]**, filed April 2, 2003, and fully briefed on June 10, 2003.  The Commissioner of Social Security issued a final decision denying Abeita's application for disability insurance benefits and supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is not well taken and will be DENIED.

## I.  Factual and Procedural Background

Abeita, now fifty-six years old (D.O.B. December 13, 1946), filed his application for disability insurance benefits on February 15, 1995, alleging disability since June 15, 1976, due to alcohol abuse and musculoskeletal impairments.  Tr. 15.  On December 18, 1995, the Administrative Law Judge (ALJ) found Abeita's personality disorder and alcoholism met or equaled Listings 12.08 and 12.09.  Accordingly, the ALJ granted Abeita's application for disability benefits.

In 1996, Congress amended the Social Security Act to provide that '[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).  Therefore, the agency advised Abeita that his case would be reviewed to determine his continued eligibility for disability benefits since his disability was based on alcoholism.

On August 13, 1997, Abeita appeared *pro se* at the administrative hearing before an ALJ. Tr. 25-59.  On September 26, 1997, the ALJ entered his decision, finding Abeita would not be disabled if he stopped using alcohol and was thus not eligible for disability benefits.  Tr. 18. Abeita filed a Request for Review of the decision by the Appeals Council.  On July 28, 1999, the Appeals Council denied Abeita's request for review of the ALJ's decision.  Abeita then sought judicial review of the Commissioner's final decision.  *See Abeita v. Apfel,* CIV No. 99-1085 JP/DJS.  On May 19, 2000, the parties filed an Agreed Motion to Reverse and Remand.  On May 24, 2000, the district court granted the motion and entered an Order, directing the Commissioner to allow Abeita to submit additional evidence and provide testimony at a hearing.  On September 22, 1999, Abeita filed an initial claim for supplemental security income benefits.  Tr. 471.

On remand, the ALJ held a hearing on November 14, 2001, at which Abeita and a vocational expert (VE) testified.  Tr. 361-89.  On February 5, 2002, the ALJ entered his decision, finding "alcoholism [was] a contributing factor material to the determination of disability at least as of the January 1997 redetermination date."  Tr. 354.  The ALJ also found that because there was not enough evidence to establish Abeita was *currently* abusing alcohol, alcohol was not "currently material to the determination of disability."  *Id.*  The ALJ then found Abeita's

2

"combination of physical and mental impairments" were not disabling within the meaning of the

Act. *Id.* Abeita filed a Request for Review of the decision by the Appeals Council. On June 20,

2002, the Appeals Council denied Abeita's request for review of the ALJ's decision. Tr. 333.

Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review

purposes. Abeita seeks judicial review of the Commissioner's final decision pursuant to 42

U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while

the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must

meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience.  Id.

In support of his motion to reverse, Abeita makes the following arguments: (1)  the ALJ failed to follow the federal court mandate; (2) the ALJ erred in failing to find him disabled as of

4

his fifty-fifth birthday; (3) the ALJ failed to consider the combination of impairments; and (4) the ALJ failed to make a proper residual functional capacity (RFC) finding.

## A.  Materiality of Alcohol Abuse

Under the regulations, the key factor the Commissioner must examine in determining whether drugs or alcohol are a contributing factor to the disability claim is whether the Commissioner would still find the claimant disabled if he or she stopped using drugs or alcohol. 20 C.F.R. §§ 404.1535(b)(1) & 416.935(b)(1).  The ALJ must evaluate which of plaintiff's current physical and mental limitations would remain if plaintiff stopped using alcohol, and then determined whether any or all of plaintiff's remaining limitations would be disabling.

The regulations make clear that a finding of disability is a condition precedent to an application of 42 U.S.C. § 423(d)(2)(C).  20 C.F.R. §§ 404.1535(a) & 416.935(a).  Therefore, the Commissioner must determine whether a plaintiff is disabled prior to finding that alcoholism is a contributing material factor.  *Id.*  The ALJ must then determine whether plaintiff would still be found disabled if he or she stopped abusing alcohol.  20 C.F.R. §§ 404.1535(b)(1) & 416.935(b)(1).   If so, then the alcohol abuse is not a contributing factor material to the finding of disability.  20 C.F.R. §§ 404.1535(b)(2)(ii) &  416.935(b)(2)(ii).  If, however, the plaintiff's remaining impairments would not be disabling without the alcohol abuse, then the alcohol abuse is a contributing factor material to the finding of disability.  20 C.F.R. §§ 404.1535(b)(2)(i) & 416.935(b)(2)(i).

Abeita claims the ALJ failed to follow the district court's mandate.  The district court's Order directed that on remand the ALJ would give Abeita the opportunity to submit additional evidence and provide testimony at the hearing.  Tr. 396.  The district court also directed the ALJ

to do the following analysis: "If Plaintiff is found disabled based on all of his impairments, including any drug and/or alcohol abuse, the ALJ will evaluate Plaintiff's impairments and determine whether they would remain if he stopped using drugs and/or alcohol, and whether the remaining limitations would be disabling." *Id.* The district court's Order merely restated §§ 20 C.F.R. §§ 404.1535 & 416.935. Abeita argues the ALJ failed "to attempt to separate out the limitations caused by the substance abuse, and to determine what limitations remain. Instead, the ALJ attempted to elude the inquiry by finding that the substance abuse alone met a Listing and the other impairments did not." Pl'.s Mem. in Supp. of Mot. to Reverse and Remand at 5-6. The Court disagrees.

The ALJ set out the *general* issues before him as (1) whether the claimant was entitled to a period of disability and disability insurance benefits; (2) whether the claimant was eligible for supplemental security income benefits; and (3) whether the redetermination under Public Law 104-121 (codified at  42 U.S.C. § 423(d)(2)(C)) that claimant was no longer entitled to a period of disability and disability insurance benefits effective January 1, 1997, was correct. Tr. 346. The ALJ set out the *specific* issues before him as (1) whether claimant was under a disability; and (2) whether substance abuse was a contributing factor material to the determination of disability. Tr. 346.

After reviewing all of Abeita's severe impairments, i.e., degenerative joint disease of the right ankle and knee, degenerative cervical disc disease with past evidence of nerve impingement with radiation to the left shoulder, lumbar disc disease, diabetes mellitus, a dysthymic disorder, borderline intellectual functioning, a dependent personality disorder, and a history of alcohol abuse, the ALJ found these "severe impairments, alone or in combination, were not severe enough

6

to meet or equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  Tr.

347.  Specifically, the ALJ reviewed Listings 1.03, 1.04, 1.05C, 9.08, 12.04 and 12.08.

Relying on Dr. Davis' evaluation, the ALJ found Abeita's right ankle and knee conditions

were not disabling.  Dr. Davis, an agency consultant, evaluated Abeita on November 24, 1999,

and noted "examination of the lower extremities showed good motion of hips, knees and left

ankle."  Tr. 432-33.  Dr. Davis found Abeita's right ankle had "pretty good movement," "no

crepitation in the joint," and only "slight decreased movement but not pain at the ankle."  Tr. 433.

Dr. Davis also found no problems with Abeita's shoulders, noting "[e]xamination of the upper

extremities revealed good motion in shoulders, elbows, wrists and digits.  Motor sensory reflex

functions were all intact.  Hand functions were good."  Tr. 432.  As to Abeita's cervical and

lumbar spine conditions, Dr. Davis found "good mobility in the neck," "no spasm or deformity in

the neck," "good mobility in the trunk and in the lumbar region," and "no deformity, spasm, or

tenderness in the back."  *Id.*  Dr. Davis concluded that the "clinical examination [was] pretty

negative in terms of the evaluation for hernias, orthopedic or neurological problems."  Tr. 433.

Dr. Davis opined Abeita had no significant orthopedic problems on examination and, therefore,

there was no reason "to advise Mr. Abeita not to be more active, or engage in work activities if he

wished to do so."  *Id.*

The ALJ also considered Abeita's November 22, 1999 x-rays of the lumber spine.  Tr.

351.  The November 22, 1999 x-rays indicated Abeita had degenerative disc disease at multiple

levels with no subluxation (dislocation).  Tr. 438.  Although Abeita complained of neck and back

pain, Dr. Davis found no significant pathology or significant decrease in range of motion.  Dr.

Davis completed a Physical Findings and Range of Motion Form and noted no problems.  Tr. 437.

Dr. Duane L. Ross, a nonexamining agency consultant and internist, reviewed Abeita's medical records and completed a Physical Residual Functional Capacity (RFC) Assessment form on December 3, 1999.  Tr. 439-446.  On the RFC form, Dr. Ross indicated Abeita's primary diagnosis was "low back pain with multi-level disc disease" and his secondary diagnosis was "neck pain."  Tr. 439.  Dr. Ross opined Abeita could lift 20 pounds occasionally but felt Abeita could lift "more like 35 pounds" occasionally.  Tr. 440.  Dr. Ross also opined Abeita could "frequently lift 25 pounds," "stand and/or walk for a total of about 6 hours in an 8-hour workday," "sit for a total of about 6 hours in an 8-hour workday," and "push and/or pull unlimited."  *Id.*  Dr. Ross explained how he arrived at these limitations, noting:

> Mr. Abeita's limitations are based on his complaints of low back and neck pain coupled with an x-ray of the lumbar spine which reveals 'degenerative disc disease at multiple levels . . . .'  Specifically, he has moderate narrowing of the L4-5 and L5-S1 disc spaces with sclerosis.  On examination, however, he has no findings of significant muscle spasm, muscle atrophy or neurologic involvement.  He was observed to walk without assistive devices and with only a slight limp.

Tr. 440.  Dr. Ross also noted Abeita had postural limitations and could only occasionally engage in climbing, balancing, stooping, kneeling, crouching, and crawling.  Again, Dr. Ross explained these limitations:

> Stooping, kneeling, crouching and crawling require varying degrees of bending at the lumbar spine where Mr. Abeita has documented disease and where he reports pain.  Because of the varying degree of bending involved, he could probably perform these maneuvers on an occasional basis and in some circumstances.  His slight limp and pain with twisting create his limitation in balancing.  The limitation in climbing occurs because of the inclusion of ladders, ropes and scaffoldings in this category.  Ramps and stairs would not require this limitation, but since they are all grouped together, a limitation for the grouping is indicated.

Tr. 441.  As to environmental limitations, Dr. Ross opined Abeita should avoid concentrated exposure to extreme cold, extreme heat, and humidity.  Tr. 443.  Abeita was also to avoid even

moderate exposure to fumes, odors, poor ventilation, etc. *Id.* Dr. Ross explained that heat, cold and humidity, as well as moderate vibration, would likely exacerbate back pain due to Abeita's multi-level degenerative disc disease. Dr. Ross did not perceive any limitation with regard to working with machinery. *Id.* Finally, Dr. Ross opined Abeita's symptoms seemed to be attributable to the disc disease but "the severity of his symptoms should not be of such magnitude that he would not be able to participate in some work activities." Tr. 444. Specifically, Dr. Ross opined Abeita "should be able to work at the level outlined previously (medium work level with some restrictions) in this form." *Id.*

The ALJ also considered Abeita's diabetes and found it did not meet Listing 9.08 because there was "no evidence of end organ damage such as neuropathy, acidosis, amputations, or retinitis." Tr. 348. Substantial evidence supports this finding. Tr. 407-414, 457-459, 464. The ALJ also noted Abeita's diabetes was first diagnosed in June of 2000.

As to Abeita's dysthymic disorder and dependent personality disorder, the ALJ found these disorders did not meet or equal Listings 12.04 and 12.08, respectively. Relying on Dr. Annette Brooks' evaluation, the ALJ did a thorough analysis of these mental impairments. Dr. Brooks, an agency consultant and psychologist, evaluated Abeita on April 5, 7, and 12, 2001. Dr. Brooks administered the following tests: (1) clinical interview with Mental Status Exam; (2) Wechsler Adult Intelligence Scale; (3) Wechsler Memory Scale; and (4) Wide Range Achievement Test.

Dr. Brooks reported Abeita was vague regarding his back pain. Abeita reported to Dr. Brooks that he had a good appetite and slept well. Abeita had lost fifteen pounds but attributed this to his change in diet due to his diabetes. Abeita stated he was occasionally sad but denied

9

depression.  Abeita reported that he easily fatigued, had low energy, and had no stress in his life.

Tr. 450.  Dr. Brooks noted Abeita was quiet, reserved and inappropriately "laughed a great deal

and made jokes" during the testing.  Tr. 451.  Dr. Brooks noted Abeita's mood was depressed,

affect appropriate, he was oriented to person, place and time, his thought processing was concrete

and simplistic with no evidence of psychotic disorder, and his performance on tasks of both social

judgment and abstraction were moderately impaired.  *Id.*  Dr. Brooks administered several tests.

Based on her interview and the test results, Dr. Brooks opined:

> Mr. Abeita is a polite, unsophisticated, and quiet 54 year old Isleta male with a history of
> heavy alcohol use, diabetes, back complaints, and long-term unemployment.  Mr. Abeita
> does not meet criteria for major depression at this time, though he presents as dysthymic.
> Uncontrolled sugars can be related to mood, but Mr. Abeita's mood complaints predate
> diagnosis of diabetes.  Formal cognitive assessment indicates that Mr. Abeita is
> functioning intellectually in the borderline range, with specific weaknesses in the areas of
> attention, concentration, and social judgment.  Achievement testing indicates a specific
> learning disorder in the area of written expression.  More focused memory assessment
> finds that Mr. Abeita's memory functioning is within average limits, when the structure
> precludes distraction and/or competing information.  However, when the structure more
> closely resembles that of day-to-day life (replete with distraction and competing
> information), Mr. Abeita's performance is in the moderately impaired range (i.e.,
> borderline).  Mr. Abeita relates that he is content with his current lifestyle and is not
> interested in change.  This presentation has apparently been stable since approximately
> 1977, with exception of alcohol use.  Mr. Abeita is not particularly forthcoming about his
> alcohol history.  Nonetheless, his history is consistent with alcohol abuse, at a minimum,
> but he reports abstinence for the past three months.  Unemployment and lack of
> responsibility have been a longstanding pattern for this patient.  In addition, he presents
> with exaggerated fears of being unable to care for himself.  He is considered competent to
> handle his own finances.

Tr. 453.  Dr. Brooks diagnosed Abeita with alcohol abuse, in early remission, disorder of written

expression, dysthymic disorder, borderline intellectual functioning, and dependent personality

disorder.  *Id.*  Dr. Brooks also assigned Abeita a current GAF score of 48.[1]  A GAF score of 48

---

[1] Global Assessment of Functioning (GAF score) is a subjective determination which
represents "the clinician's judgment of the individual's overall level of functioning."   American
Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th

indicates serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV-TR at 34.

The ALJ cited to Dr. Brooks' evaluation and followed the procedure set forth in 20 C.F.R. § 404.1520a and in *Cruse v. Dep't of Health & Human Servs.*, 49 F.3d 614 (10th Cir. 1995).  In *Cruse,* the Court of Appeals for the Tenth Circuit set forth the procedure the Commissioner must follow when there is evidence of a mental impairment that allegedly prevents a claimant from working.  The Commissioner must follow the procedure set forth in 20 C.F.R. § 404.1520a and the Listing of Impairments and document the procedure.  *Id.* at 617.  This requires the Commissioner "to determine the presence or absence of 'certain medical findings which have been found especially relevant to the ability to work,' sometimes referred to as the 'Part A' criteria."  *Id.* (quoting 20 C.F.R. § 404.1520a(b)(2)). The Commissioner must then "evaluate the degree of functional loss resulting from the impairment, using the 'Part B' criteria."  *Id.* (quoting 20 C.F.R. § 404.1520a(b)(3)).  The ALJ must then record his or her conclusions by preparing a Psychiatric Review Technique Form (PRT form) that "tracks the listing requirements and evaluates the claimant under the Part A and B criteria."  *Id.*

In this case the ALJ found:

> The claimant's dysthymic disorder and dependent personality disorder do not meet or equal Listing Sections 12.04 and/or 12.08, respectively.
>
> It is questionable whether Mr. Abeita even meets the Part A criteria under these listing sections.  In her April 12, 2001 report, J. Annette Brooks, Ph.D. noted that Mr. Abeita reported good appetite and sleep.  Although he had lost some weight, he attributed this to a

---

ed. 2000) (DSM-IV-TR).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  DSM-IV-TR at 34.

change in diet related to diabetes.  He admitted to occasional sadness and loneliness but did not see himself as depressed.  He denied throughts (sic) of death, dying, or homicidal ideation.  Although he admitted to fleeting suicidal ideation, he denied plan or intent and had not history of attempts.  He reported that he became fatigued easily and had low energy (Exhibit 57, p1).

The record also does not establish that the claimant has had marked restriction of activities of daily living, marked difficulties maintaining social functioning, or marked difficulties in maintaining concentration, persistence, or pace, pursuant to Parts B1, B2, B3.  There is also no evidence that the claimant has had repeated episodes of decompensation each of extended duration, pursuant to Part B4.

Tr. 348.  The ALJ then cited to the evidence to support his findings.  As to activities of daily living, the ALJ found Abeita had a fairly active lifestyle.  The ALJ referred to Abeita's testimony that he watched television, read magazines, and took out the trash.  The ALJ also cited Abeita's history form (Tr. 436) in which Abeita reported his daily activities included cleaning his house, preparing his meals, washing his dishes, listening to the radio/stereo, eating out, and visiting with friends.  Tr. 348, 352.  In the same form, Abeita reported his hobby was watching boxing.  Tr. 348.  Based on these findings, the ALJ concluded the evidence did not support a marked restriction in daily activities.

The ALJ also found the evidence did not support a finding of marked difficulties in maintaining social functioning.  The evidence indicated Abeita was able to maintain a relationship with a girlfriend for over year despite his problems.  The ALJ also considered Abeita's testimony that he visits friends and friends visit him (Tr. 436).  Tr. 348.

The ALJ cited to Dr. Brooks' evaluation and also found the evidence did not support a finding that Abeita was markedly impaired in the ability to maintain concentration, persistence, or pace.  Tr. 348.  The ALJ considered Dr. Brook's finding that Abeita had "specific weaknesses in

the area of attention, concentration, and social judgment," but also noted "[Dr. Brooks] went on to say that claimant's functioning was in the moderately impaired range." *Id.*

Finally, the ALJ found "no evidence of repeated episodes of decompensation, marginal adjustment resulting from a residual disease process, or inability to function outside of a highly supportive living arrangement that would approach the Part C criteria under Listing Section 12.04." Tr. 349. Substantial evidence supports this finding.

Abeita takes issue with the ALJ giving Dr. Brooks' GAF score of 48 "no significant weight." Pl.'s Mem. in Supp. of Mot. to Reverse or Remand at 12. Abeita contends the ALJ should have questioned Dr. Brooks about the consultative evaluation and sought clarification "instead of providing his own psychological opinion." *Id.* at 13. The ALJ found:

> Although Dr. Brooks found that the claimant had a Global Assessment of Functioning (GAF) of 48, this conclusion is not consistent with the evidence of record, including Dr. Brooks' own objective findings showing limitations in the moderate range. Therefore, I give her GAF score of 48 no significant weight. It is interesting to note that she concludes her evaluation by stating that "Unemployment and lack of responsibility have been a longstanding pattern for this patient."

Tr. 348 (citations to the record omitted). The ALJ gave a specific legitimate reason for giving little weight to Dr. Brooks assigning a GAF score of 48 to Abeita. As the trier of facts, the ALJ has the duty to resolve any conflict in the evidence *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991). The Court may not reweigh the evidence or substitute its judgment for that of the agency. *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987).

Having reviewed all of Abeita's severe impairments, the ALJ then found Abeita "met the requirements of Listing 12.09 *at least as of the date of redetermination* of January 1, 1997 because of alcohol abuse." Tr. 349 (emphasis added). Specifically the ALJ found:

13

I note that the claimant was initially found to be disabled based on Listing Section 12.09. The evidence discussed below shows that the claimant continued to abuse alcohol at least through the January 1, 1997 redetermination date. However, the claimant's other medical impairments, in the absence of alcohol abuse, have not approached listing level. Thus, the medical evidence establishes that the claimant's impairments would not be disabling at listing level if he were not using alcohol. Therefore, to the extent that the claimant's condition meet (sic) Listing 12.09, alcohol abuse would be a contributing factor material to the determination of disability, resulting in a finding of 'not disabled' pursuant to Section 105 of Public Law 104-121.

Tr. 349. Later in the decision, the ALJ stated:

20 C.F.R. § 404.1535 and 416.935 provide that the key factor we will use in determining whether substance abuse is a contributing factor material to the determination of disability is whether we would still find the claimant disabled if he stopped using alcohol or drugs.

In making this determination, we must evaluate which of the claimant's current physical and mental limitations would remain if he stopped using alcohol or drugs. We must then determine if any or all of the remaining limitations would be disabling. Since the above analysis shows that Mr. Abeita's remaining limitations would not be disabling, I find that alcoholism is a contributing factor material to the determination of disability at least as of the January 1997 redetermination date. Therefore, the determination that he was no longer under a disability effective January 1, 1997 pursuant to Section 105 of Public Law 104-121 is hereby affirmed.

There is not enough evidence to establish that the claimant is currently engaging in alcohol abuse. Therefore, alcohol abuse is not currently material to the determination of disability. However, the above analysis shows that the claimant's combination of physical and mental impairments, excluding alcohol abuse, is not disabling with the meaning of the Act.

Tr. 354. It is clear to the Court that the ALJ applied § 423(d)(2)(C) correctly. The ALJ set out the issues he had before him. The first issue before the ALJ was whether the redetermination under Public Law 104-121 (codified at 42 U.S.C. § 423(d)(2)(C)) that claimant was no longer entitled to a period of disability and disability insurance benefits effective January 1, 1997, was correct. The ALJ cited to the record in support of his finding that Abeita continued to abuse alcohol at least through the January 1, 1997 redetermination date and thus found alcohol was material to the determination of disability. Accordingly, the ALJ affirmed the determination that

14

Abeita was no longer under a disability effective January 1, 1997, pursuant to Section 105 of Public Law 104-121.  Tr. 354.

The second issue before the ALJ was whether Abeita was under a disability and whether substance abuse was a contributing factor material to the determination of disability.  Because the ALJ found there was not enough evidence to establish Abeita was *currently* abusing alcohol, he found alcohol was not "*currently* material to the determination of disability."  *Id.* (emphasis added).  However, prior to reaching this conclusion, the ALJ set out his analysis in support of his finding that Abeita's "combination of physical and mental impairments" were not disabling within the meaning of the Act.  *Id.*   The regulations require the Commissioner determine whether a plaintiff is disabled prior to finding that alcoholism is a contributing material factor.  The ALJ adhered to this requirement and substantial evidence supports his findings.  Accordingly, the Court finds that Plaintiff's argument that the ALJ failed to follow the district court's mandate and his argument that the ALJ failed to consider the combination of impairments are without merit.

## B.  RFC Finding

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require that an ALJ must provide a "narrative discussion describing how the evidence supports" his or her conclusion. See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  *Id.*  The ALJ must

also explain how any material inconsistencies or ambiguities in the case record were considered

and resolved." *Id.* "The RFC assessment must include a discussion of why reported symptom-

related functional limitations and restrictions can or cannot reasonably be accepted as consistent

with the medical or other evidence." *Id.* The RFC assessment "must not be expressed initially in

terms of the exertional categories of "sedentary [or] light; "rather, a function-by-function

evaluation is necessary in order to arrive at an accurate RFC. *Id.* at *3 ("[A] failure to first make

a function-by-function assessment of the [claimant's] limitations or restrictions could result in the

adjudicator overlooking some of [the claimant's] limitations or restrictions.").

      In this case, the ALJ considered Dr. Gwen Y. Sun's evaluation.  Dr. Sun opined Abeita

could lift up to 50 pounds occasionally, lift up to 20-30 pounds frequently, stand/walk for 1-2

hours in an 8-hour workday and 3-4 hours with interruption, and had no sitting, reaching, feeling,

speaking, handling, hearing, or traveling restrictions  Tr. 299-303.  The ALJ also considered Dr.

Davis' evaluation which was previously discussed.  The ALJ noted Abeita's medical records,

finding Abeita had no subsequent treatment records concerning his alleged impairments in the

knee, shoulder, and ankle.  Tr. 350.  The ALJ also noted that Abeita's x-rays of the lumbar spine

showed moderate disc space narrowing at L4-5 and L5-S1 with sclerosis of the endplates but with

no subluxation.  Tr. 351. The ALJ reviewed the records from PHS Indian Medical Center and

noted Abeita had been diagnosed with diabetes but had improved blood sugar control.  *Id.*

Significantly, the ALJ noted that the PHS Indian Hospital progress notes from October 30, 2000

through May 17, 2001, made no mention of orthopedic problems.  *Id.*  The ALJ discussed Dr.

Ross' RFC assessment which he found consistent with the evidence of record.  Dr. Ross found

Abeita could lift up to 35 pounds occasionally, 25 pounds frequently, could sit, stand, and/or walk

for six hours in an 8-hour workday, and had no limitations in his ability to push and pull. *Id.*   The

ALJ considered Dr. Brooks evaluation and opined it was consistent with the ability to perform

simple, unskilled, repetitive work.  Tr. 352.  The ALJ discussed Abeita's use of pain medication.

The ALJ also discussed Abeita's activities of daily living.  Tr. 352.  Thus, the ALJ thoroughly

discussed all the evidence to support his RFC finding.  Accordingly, the Court finds that

substantial evidence supports the ALJ's RFC finding.

### C.  Finding of Disability Pursuant to the Medical-Vocational Guidelines

Abeita contends the ALJ should have found he was disabled pursuant to Rule 202.04 of

the Medical-Vocational Guidelines (the grids).  When a claimant's RFC, age, education, and

training exactly fit one of the rules listed on the grids, the regulations direct the Commissioner to

rely on the grids conclusively to determine disability at step five of the sequential evaluation

process.  *See Channel v. Heckler ,* 747 F.2d 577, 579 (10th Cir.1984).  However, a claimant must

be able to perform the full range of work in a particular RFC category (i.e. sedentary, light,

medium, heavy, or very heavy) before the ALJ may place him or her in that category.  *Id.* at 579-

80.  Because Abeita was unable to perform the full range of work in a particular RFC category,

the ALJ did not conclusively rely on the grids, but rather, he consulted with a vocational expert

(VE) to find Abeita not disabled.  The ALJ posed the following hypothetical to the VE:

> I want you to assume that the claimant is 54 years old that he has a 12th grade education
> or the equivalency thereof, that he has no past relevant work, that he can lift 35 pounds
> occasionally, 25 pounds frequently and stand, sit or walk up to 6 hours in an 8-hour day,
> can occasionally climb, balance, stoop, kneel, crawl and crouch, is limited to simple,
> repetitive work, should avoid concentrated exposure to extreme cold, extreme heat,
> humidity and to hazards, should avoid moderate exposure to working in areas of vibration.
> Based upon that hypothetical, is there work available in the regional and national
> economies in substantial numbers that such a person could do, in your opinion?

17

Tr. 383-84.  The VE testified Abeita could perform the jobs of laundry worker, cleaner, and linen-room attendant.  Tr. 384.  The VE further testified that these jobs were unskilled and at the medium exertional level.  *Id.*

Because the job of cleaner is classified as light by the DOT (*Dictionary of Occupational Titles*, 1011 (4th ed. 1991)), Abeita argues the ALJ should have found him disabled under Rule 202.04  "given his advanced age of fifty-five, a high school education and no past relevant work."  Pl.'s Mem. in Supp. of Mot. to Reverse and Remand at 9.  The Commissioner responds that Rule 202.04 applies when a claimant has an RFC limited to light work and thus does not apply in this case.  The Commissioner is correct.  Table No. 2  is specific for an RFC limited to "light work as a result of severe medically determinable impairments."  *See* 20 C.F.R. Pt. 404, Subpt. P,  App. 2, Table No. 2.  In this case, the ALJ found Abeita's RFC to be "a limited range of medium work." Tr. 350.

Abeita also claims the jobs of laundry worker and linen-room attendant require a reasoning level higher than 1.  The laundry worker occupation has a reasoning level of 2 and the linen room attendant has a reasoning level of 3.  Additionally, a laundry worker is subjected to frequent exposure to extreme heat, wetness, and humidity.[2]  Because the ALJ limited Abeita to "simple, repetitive work," Abeita contends he cannot perform these jobs.  Specifically, Abeita

_____

[2] Dr. Ross was very specific in his RFC assessment that Abeita should avoid concentrated exposure to extreme cold and extreme heat.  Tr. 443.  Dr. Ross opined that "[e]xtreme heat, cold and humidity as well as moderate vibration [were] all likely to exacerbate back pain based on multi-level degenerative disease."  *Id.*  The ALJ also included these restrictions in his hypothetical to the VE.  The job of laundry worker requires frequent exposure to heat and humidity.  *See* Pl.'s Mem. in Supp. of Mot. to Reverse and Remand, Ex. A, pg. 4 (DOT for  Laundry Worker II, 361.685-018).  Accordingly, based on Dr. Ross' RFC assessment, which the ALJ adopted (Tr. 351), the Court finds that Abeita is precluded from performing the job of laundry worker.

asserts that in order for a job to be consistent with the restriction of simple, repetitive work, it must have a reasoning level of 1.  Pl.'s Mot. in Supp. of Mot. to Reverse and Remand at 7. However, Plaintiff concedes he is not aware of any authority providing that simple, repetitive work must have a reasoning level of 1.  Pl.'s Reply to Def.'s Response at 1.

      The Commissioner disagrees with Abeita's assertion and responds that the occupations of laundry worker and linen-room attendant are jobs with a specific vocational preparation (SVP) of 2, which the DOT identifies as being unskilled because they require thirty days to learn. Therefore, the Commissioner contends these occupations fall within the RFC of simple, repetitive work.  The Commissioner also argues that the VE found Abeita could perform the job of cleaner which is listed in the DOT as light with a reasoning level of one.  The Commissioner contends that when a claimant can perform the demands of medium work, he can also perform sedentary and light work.  Because the job of cleaner is compatible with Abeita's RFC, the Commissioners asserts she has met her burden at step five of the sequential evaluation process.

      The regulations define unskilled work as work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  20 C.F.R. §§ 404.1568 & 416.968 (emphasis added).  Additionally, a job is considered unskilled if "a person can learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  *Id.*  The DOT assigns an SVP Level of 2 (anything beyond short demonstration up to and including 1 month) to the jobs of  linen-room attendant and cleaner.  The VE also testified these jobs were unskilled work.  Tr. 384.  The DOT also assigns a Reasoning Level of  3 to the job of linen-room attendant.  The DOT defines a reasoning level of 3 as the ability to:  "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal

19

with problems involving several concrete variables in or from standardized situations." Pl.'s Mem. in Supp. of Mot. to Reverse and Remand, Ex. B (Dot 222.387-030)(emphasis added). The DOT also states the job of linen-room attendant is performed at the medium exertional level, requires low general learning ability and low aptitudes, and is repetitive or short-cycle work. *Id.* The DOT assigns a Reasoning Level of 1 to the job of cleaner. The DOT, defines a Reasoning Level of 1 as the ability to: "Apply commonsense understanding to carry out simple one-or two-step instructions. Deal with standardized situations with occasional or no variable in or from these situations encountered on the job." Pl.'s Mem. in Supp. of Mot. to Reverse and Remand, Ex. C (Dot 323.687-014)(emphasis added). The DOT also states the job of cleaner is at the light exertional level, requires low general learning ability and low aptitudes, and is repetitive or short-cycle work. *Id.*

Dr. Brooks evaluated Abeita and found his "[t]hought processing was concrete and simplistic." Tr. 451. The job of linen-room attendant requires commonsense understanding and dealing with problems involving concrete variables. *See, also Taylor v. Chater*, No. 95-55886, 1996 WL 665122, at *1 (9th Cir. Nov.7, 1996)(Court defined simple, repetitive work as "Work that requires commonsense understanding is simple, and standardized situations occur repetitively."). Moreover, the VE was present throughout the administrative hearing and heard all the evidence and opined Abeita could perform the job of linen-room attendant. Accordingly, having reviewed the ALJ's decision, the medical record, and the applicable law, the Court finds that the ALJ's decision adheres to the applicable legal standards and that substantial evidence supports the ALJ's determination that, despite his limitations, plaintiff could perform a significant number of jobs that exist in the national economy.

20

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**